OFFICE OF THE CLERK

# UNITED STATES BANKRUPTCY COURT

Laura A. Austin
Clerk of Court

DISTRICT OF SOUTH CAROLINA
J. BRATTON DAVIS UNITED STATES BANKRUPTCY COURTHOUSE
1100 LAUREL STREET
COLUMBIA, SOUTH CAROLINA 29201-2423

TELEPHONE (803)765-5436
www.scb.uscourts.gov

DATE:   November 12, 2019

TO:     Frank Scott Dabney and Kathryn Harrelle Dabney c/o
        Robert B. Varnado, Esquire    AND    Jason S. Luck, Esquire
        103 Ronnie Boals Blvd.                1075 E. Montague Avenue
        P.O. Box 1127                         North Charleston, SC 29405
        Mt. Pleasant, SC 29465


        Bank of America, NA                   Specialized Loan Servicing, LLC
        Brian A. Calub, Esquire               Brian M. Barnwell, Esquire
        McGuire Woods LLP                     Nelson, Mullins, Riley & Scarborough, PA
        201 North Tryon Street                1320 Main Street / 17th Floor
        Suite 3000                            Columbia, SC 29201
        Charlotte, NC 28202-2146


        Shellpoint Mortgage Servicing         The Bank of New York-Mellon
        Damon C. Wlodarczyk, Esquire          Damon C. Wlodarczyk, Esquire
        Riley Pope & Laney, LLC               Riley Pope & Laney, LLC
        2838 Devine Street                    2838 Devine Street
        Columbia, SC 29205                    Columbia, SC 29205


RE:     Frank Scott Dabney and Kathryn Harrelle Dabney, 17-80037-JW
        Frank Scott Dabney Kathryn Harrelle Dabney vs. BANK OF AMERICA,
        N.A. SPECIALIZED LOAN SERVICING, LLC Shellpoint Mortgage
        Servicing Bank of New York Mellon c/o Shellpoint Mortgage Servicing


        Pursuant to Federal Rule of Bankruptcy Procedure 8003, this letter is to notify you that a notice of appeal in the above-referenced case was filed in this Court on November 8, 2019. A copy of that notice along with a copy of the judgment, order, or decree of this Court which has been appealed is included with this letter. In deciding what action to take in response to this appeal, it may be helpful to review Part VIII of the Federal Rules of Bankruptcy Procedure, which governs the procedure on an appeal from a judgment, order, or decree of a bankruptcy court.

Federal Rule of Bankruptcy Procedure 8009 sets forth the procedure and deadlines for designating the record on appeal.  If you need to order transcripts, a Transcript Order Form AO435 is available through the Court's website, www.scb.uscourts.gov.

The record on appeal will be transmitted from this office to the Clerk of Court for the United States District Court for the District of South Carolina, upon completion, pursuant to Federal Rule of Bankruptcy Procedure 8010.  Parties to the appeal will receive notice once the record on appeal is received by the District Court.  Typically, an appeal and the associated record on appeal are transmitted to the District Court within thirty (30) days from the final designation of the record on appeal and the receipt of any requested transcript.[1]

At the request of the Clerk of Court for the United States District Court for the District of South Carolina, parties to this appeal are hereby advised that any designation of the record must contain a statement as to whether or not there is, or ever has been, an appeal to the District Court in any related case or adversary proceeding.

Laura A. Austin, Clerk of Court
United States Bankruptcy Court

BY: _____
C. Tull, Deputy Clerk

Enclosures

cc:  United States Trustee

---

[1] Transmittal may be delayed in certain instances beyond the control of the Court, such as where designations are voluminous or require the retrieval of archived documents.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| **In re: Frank Scott Dabney** and **Kathryn Harrelle Dabney** | ) ) ) | Case No.: 13-04227-JW |
| | | Chapter 13 |
| Debtors | ) ) | |
| ———————————————— | ) ) | Adv. Case No.: 17-80037-JW |
| **Frank Scott Dabney** and **Kathryn Harrelle Dabney**, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| **Bank of America, N.A., Specialized Loan Servicing, LLC; Shellpoint Mortgage Servicing;** and **The Bank of New York Mellon;** | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) | |

### NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

**Frank Scott Dabney and Kathryn Harrelle Dabney**

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.

[ **X** ] Plaintiff
[   ] Defendant
[   ] Other (describe) _____.

(describe)_____.

For appeals in a bankruptcy case and not in an adversary proceeding

[   ] Debtor
[   ] Creditor
[   ] Trustee
[   ] Other

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from: **Order Granting Defendant's Motion for Summary Judgment (37 pages).**

2. State the date on which the judgment, order, or decree was entered: **October 25, 2019.**

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: **Bank of America, NA**      Attorney:      **Brian A. Calub, Esquire
McGuire Woods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
(704) 343-2009
BCalub@mcguirewoods.com**

2. Party: **Specialized Loan
Servicing, LLC**      Attorney:      **Brian M. Barnwell, Esquire
Nelson, Mullins, Riley & Scarborough,
P.A.
1320 Main Street / 17th Floor
Columbia, SC 29201
(803) 255-9233
Brian.Barnwell@nelsonmullins.com**

3. Party: **Shellpoint Mortgage
Servicing**      Attorney:      **Damon C. Wlodarczyk, Esquire
Riley Pope & Laney, LLC
2838 Devine Street
Columbia, SC 29205
(803) 799-9993
damonw@rplfirm.com**

4. Party: **The Bank of New York-
Mellon**      Attorney:      **Damon C. Wlodarczyk, Esquire
Riley Pope & Laney, LLC
2838 Devine Street
Columbia, SC 29205
(803) 799-9993
damonw@rplfirm.com**

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

[ X ] Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign below**

*/s Robert B. Varnado*

_____       Date:  **November 8, 2019**

Signature of attorneys for appellant

**Robert B. Varnado, Esquire**
**Brown & Varnado, LLC**
**103 Ronnie Boals Blvd. (29464)**
**P.O. Box 1127**
**Mt. Pleasant, SC 29465**
**(843) 737-7300**
**(843) 654-5109 fax**
**rvarnado@brown-varnado.com**

**Jason S. Luck, Esquire**
**Garrett Law Offices, LLC**
**1075 E. Montague Avenue**
**North Charleston, SC 29405**
**(843) 554-5515**
**(843) 747-3198 fax**
**jluck@garrettlawsc.com**

## **Certificate of Service**
## **13-04227-JW**

I did this date serve the attached document(s) on the parties listed below by placing them in the United States mail with proper postage affixed thereto and addressed as follows or via the ECF system:

Brian A. Calub, Esquire
McGuire Woods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
*Attorney for Defendant Bank of America, N.A.*

Brian M. Barnwell, Esquire
Caroline Gimenez, Esquire
Nelson, Mullins, Riley & Scarborough, P.A.
1320 Main Street / 17th Floor (29201)
P.O. Box 11070
Columbia, SC 29211
*Attorneys for Defendant*
*Specialized Loan Servicing, LLC*

Damon C. Wlodarczyk, Esquire
Jayme L. Shy, Esquire
Riley Pope & Laney, LLC
2838 Devine Street
Columbia, SC 29205
*Attorneys for Defendants*
*Shellpoint Mortgage Servicing*
*and The Bank of New York Mellon*

November 8, 2019                    *s/ Robert B. Varnado*

                                   _____

                                   Robert B. Varnado

## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **13-04227-jw**
Adversary Proceeding Number:  **17-80037-jw**

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The relief set forth on the following pages, for a total of 37 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**10/25/2019**



John E Waites
US Bankruptcy Judge
District of South Carolina

Entered: 10/25/2019

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re: Frank Scott Dabney and Kathryn Harralle Dabney,<br><br>Debtors,<br><hr>Frank Scott Dabney and Kathryn Harrelle Dabney,<br><br>Plaintiffs,<br><br>v.<br><br>Bank of America, N.A; Specialized Loan Servicing, LLC; Shellpoint Mortgage Servicing; and The Bank of New York Mellon,<br><br>Defendants. | Bankruptcy Case No.: 13-04227-JW<br><br>Adv. Pro. No.: 17-80037-jw<br><br><br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

This matter came before the Court for a hearing on the joint Motion for Summary Judgment filed by Defendants Shellpoint Mortgage Servicing ("Shellpoint") and The Bank of New York Mellon ("BNYM") and the joint Motion for Summary Judgment filed by Defendants Specialized Loan Servicing, LLC ("SLS"), and Bank of America, N.A. ("BANA") (collectively, "Motions"). Plaintiffs filed objections to the Motions. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). The parties have consented to this Court's entry of final orders and judgments. Pursuant to Fed. R. Civ. P. 52, which is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law:[1]

---

[1]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

## **PROCEDURAL BACKGROUND**

Plaintiffs commenced this adversary proceeding on March 30, 2017, by filing a complaint against Defendants, the current and former holder and servicers of their Mortgage loan, alleging claims arising out of an alleged discrepancy between the adjustable interest rate provision of the Note and the provision in the Adjustable Rate Mortgage Rider simultaneously executed by Plaintiffs at the closing—the Adjustable Rate Mortgage Rider provides for an adjustable interest rate floor, while the Note does not.  Plaintiffs allege that the Note is the controlling document and the absence of an adjustable interest rate floor in the Note should have allowed the interest rate charged to them on the loan to drop below that charged by the Defendants, resulting in an overcharge.

By order entered July 11, 2017, this Court granted motions to dismiss filed by SLS, Shellpoint and BNYM on the grounds that the facts alleged by Plaintiffs in the Complaint were insufficient to state plausible claims based upon violation of the automatic stay of 11 U.S.C. § 362 or contempt.  On November 8, 2017, the Court granted the remaining defendant BANA's motion for judgment on the pleadings, finding that the Note and Adjustable Rate Mortgage Rider should be read as a single, unified transaction to provide for the adjustable interest rate floor, and thus the interest rate charged to Plaintiffs was proper and the conduct upon which all of Plaintiffs' claims are based could not form the basis for any claim upon which relief could be granted. Plaintiffs appealed this order to the District Court.   On appeal, the District Court found that the loan documents were ambiguous regarding the interest rate floor issue and held that parol evidence indicating the parties' understanding and intentions at the time of the loan closing might resolve that ambiguity.  This Court allowed Plaintiffs to file an Amended Complaint on January 15, 2019,

which raised new claims against BANA, SLS, Shellpoint, and BNYM, and allowed the parties an opportunity for discovery. The parties completed discovery on June 5, 2019.[2]

On June 17, 2019, BANA and SLS filed their joint motion for summary judgment with supporting exhibits, and BNYM and Shellpoint filed their joint motion for summary judgment, wherein they joined all applicable arguments raised by BANA and SLS. Plaintiffs timely objected to the Motions. A hearing was held on the Motions on July 25, 2019, which was attended by counsel for all parties.

## UNDISPUTED FACTS

### *The Loan Documents*

On May 11, 2006, Plaintiffs executed and delivered to Lendmark Financial Services, Inc. ("Lendmark"), an adjustable rate note in the original principal amount of $304,000 ("Note").[3] With respect to the interest rate to be charged on the sums loaned (the "Loan"), the Note provides as follows:

> **2. INTEREST.** Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.000%. The interest rate I will pay may change in accordance with Section 4 of this Note.
>
> . . .
>
> **4. INTEREST RATE AND MONTHLY PAYMENT CHANGES.**
>
> **(A) Change Rates.** The interest rate I will pay may change on the **first** day of **June, 2009** and on that day every **6** months thereafter. Each date on which my interest rate could change is called a "Change Date."
>
> …

---

[2] On August 13, 2019, the Court entered an order denying Plaintiffs' motion to extend time for discovery finding that Plaintiffs failed to demonstrate diligence during the discovery period that constitutes good cause for an extension under Fed. R. Civ. P. 16(b)(4).

[3] In response to the Motions, Plaintiffs assert that the Note contains forged signature(s) and that a second note (the 3% note) was revealed during discovery, purportedly executed by Plaintiffs, which was substantially similar except that the amount the interest rate could be increased or decreased on any single Change Date was 3.000% instead of 1.000%. Plaintiffs attached an affidavit of their counsel in this proceeding reporting the existence of the second note and declaring his belief that the signatures on the Note are forged signatures. For the reasons set forth in detail below, Plaintiffs are precluded from raising arguments in opposition to summary judgment in this proceeding based upon an alleged forgery of the Note at issue.

**(C) Calculation of Changes.** Before each Change Date, the Note Holder will calculate my new interest rate by adding **5.125** percentage point(s) (**5.125%**) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes.** The interest rate I am required to pay at the first Change Date will not be greater than **11.000%** or less than **8.000%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **1.000** percentage point(s) (**1.000%**) from the rate of interest I have been paying for the preceding **6** months.  My interest rate will never be greater than **14.000**%.

The Note is secured by a first mortgage lien ("Mortgage") contemporaneously executed and delivered by Plaintiffs to Lendmark on May 11, 2006.  The Mortgage encumbers a parcel of real estate and the improvements thereon located at 1844 Chelwood Circle, Charleston, SC 29407 ("Property"), which is owned by Plaintiffs and serves as their primary residence.  Plaintiffs admit they had the opportunity to read the loan documents before signing them.  They do not recall any of the conversations they had during the closing of the Loan.[4]

Contemporaneous with the execution of the Note and Mortgage, Plaintiffs executed and delivered to Lendmark an Adjustable Rate Rider ("ARR") which, by its express terms, "is incorporated into and shall be deemed to amend and supplement the Mortgage . . . of the same date

---

[4]       Representation by counsel of the borrower at a real estate loan closing is required under South Carolina law. *See State v. Buyers Serv. Co.*, 292 S.C. 426, 434, 357 S.E.2d 15, 19 (1987) (holding that real estate and mortgage loan closings should be conducted only under the supervision of attorneys, who have the ability to furnish their clients legal advice should the need arise and fall under the regulatory rules of this court.) Plaintiffs did not present the testimony of the closing attorney by affidavit or otherwise to support their opposition to the Motions.

given by [Plaintiffs] to secure [the Note]."[5]  The ARR contains the following language regarding

the interest rate to be charged on the Loan:

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

. . .

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES.**

The Note provides for an initial interest rate of **8.000%.**  The Note provides for changes in the adjustable interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES.**

**(A)      Change Dates.** The adjustable interest rate I will pay may change on the first day of **June, 2009** and on the same day of every **6** month(s) thereafter. Each date on which my adjustable interest rate could change is called the "Change Date."

. . .

**(C)      Calculation of Changes.** Before each Change Date, the Note Holder will calculate my new interest rate by adding **5.125** percentage point(s) (**5.125**%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)      Limits on Interest Rate Changes.** The interest rate I am required to pay at the first Change Date will not be greater than **11.000%** or less than **8.000%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **1.000** percentage point(s) (**1.000%**) from the rate of interest I have been paying for the preceding **6** month(s). ***My interest rate will never be greater than 14.000%, or less than the initial interest rate stated above.***

---

[5]      The Mortgage provides that, "the covenants and agreements of [the ARR] shall be incorporated into and shall amend and supplement the covenants and agreements of [this Mortgage] as if the [ARR] were a part of [the Mortgage]."

(Emphasis added).

The ARR explains the adjustable interest rate of the Note, including the initial rate, calculation and timing of the adjustments to the interest rate, and the upper and lower limits on the interest rate changes.  The Mortgage and ARR were recorded in the Charleston County Register of Deeds Office on May 19, 2006, in Book A584, pages 861 and 869, respectively.

### Transfers of the Note & Servicing of the Loan

Lendmark sold, transferred, and assigned the Note, Mortgage, and Adjustable Rate Rider (collectively the "Loan Documents") to Countrywide Bank, N.A. on May 11, 2006.  On or about September 2, 2006, Countrywide Bank, N.A. endorsed the Note to Countrywide Home Loans, Inc. Countrywide Home Loans, Inc. then sold and transferred the Note through blank endorsement to CWABS, Inc.  CWABS, Inc. then conveyed its interest in the Note to BNYM as Trustee of the trust for registered holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-17.

From the closing of the Loan until December 14, 2013, Plaintiffs' Loan was serviced by BANA or its predecessors-in-interest, including Countrywide Bank, N.A., Countrywide Home Loans, Inc., Countrywide Home Loan Servicing, LP, and BAC Home Loan Servicing.  From December 15, 2013 until December 21, 2016, Plaintiffs' Loan was serviced by SLS.  From December 22, 2016 until November 15, 2018, Plaintiffs' Loan was serviced by Shellpoint.  Since November 16, 2018, Plaintiffs' Loan has been serviced by BANA.

### Interest Charges on the Loan

Throughout the duration of the loan, Plaintiffs have been charged interest at the rate of 8%. Plaintiffs allege, however, that according to the Note, beginning June 1, 2009, they should have been charged interest at a rate less than 8% because the LIBOR index + 5.125% fell below 8% at that time.

6

### *State Court Foreclosure Action*

On September 7, 2012, BNYM filed a complaint against Plaintiffs seeking foreclosure of the Mortgage in Charleston County, South Carolina.  Plaintiffs did not file an answer and were held in default.

### *Plaintiffs' First Bankruptcy Case*

On November 21, 2012, Plaintiffs filed a petition under Chapter 13 of the Bankruptcy code, which stayed the pending state court foreclosure action.  In their schedules, Plaintiffs listed BANA as a secured creditor and did not indicate on Schedule D that its claim was disputed.  BANA filed a proof of claim on January 28, 2013, asserting a secured claim in the amount of $312,964.31, and attached copies of the Note, Mortgage, ARR and other supporting documentation.[6]  That bankruptcy case was dismissed on February 7, 2013 due to Plaintiffs' failure to attend the § 341 meeting of creditors.  After the dismissal of the bankruptcy case, BNYM recommenced its foreclosure proceeding in state court, filing an affidavit of default on March 22, 2013.

### *Plaintiffs' Second Bankruptcy Case*

On June 19, 2013, the state court entered an Order of Judgment of Foreclosure and Sale in favor of BNYM.  Plaintiffs filed a second petition under Chapter 13 of the Bankruptcy Code on July 25, 2013 to halt the sale.  In their schedules, Plaintiffs again listed BANA as a secured creditor and did not indicate on Schedule D that its claim was disputed.  On February 28, 2014, Plaintiffs' bankruptcy counsel filed a proof of claim on behalf of BANA asserting a secured claim, which set forth a total balance due of $322,964.31, including prepetition arrearage of $44,000.  No party objected to or sought to amend the claim filed by Plaintiffs as Debtors and therefore the claim was

---

[6]      *See Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records.")

deemed allowed. Plaintiffs' chapter 13 plan was confirmed on December 9, 2013. The confirmed

plan provided for Plaintiffs to cure the arrearage owed to BANA by making payments of $734 per

month and continue making regular non-arrearage payments on the allowed claim. The confirmed

plan further provided "Nothing herein is intended to waive or adversely affect any rights of the

debtor, the trustee, or party with respect to any causes of action owned by the debtor."[7]

On June 6, 2014, SLS filed a Notice of Payment Change, asserting an adjustment in the

payment amount from $2,229.67 to $2,229.66, and no change to the interest rate of 8.0%. No

objection was filed to the Notice of Payment Change.

On July 9, 2014, SLS filed a motion for relief from stay on behalf of BNYM, asserting that

Plaintiffs failed to make three post petition payments of $2,229.67, totaling $6,689.01. SLS

attached to its motion copies of the Note, Allonge, the first and last pages of the Mortgage,

Assignment of Mortgage from Lendmark to BNYM and a payment history indicating that the

payment amount due for each month was $2,229.67 from August 1, 2013 through June 9, 2014.

Plaintiffs filed a Response to the motion for relief from stay, wherein they admitted they were

behind on payments due on this loan and requested an agreement allowing time to catch up on

payments. On August 4, 2014, Plaintiffs and SLS entered into a Settlement Order, wherein the

parties agreed that Plaintiffs had accrued a post petition arrearage of $809, which included payment

for July 2014 in the amount of $2,229.66 plus attorney's fees and costs in the amount of $476, less

amounts in the suspense account of $1,896.16. Plaintiffs agreed to catch up the post petition

arrearange and remit to SLS the regular post petition monthly payments beginning August 1, 2014

and continuing thereafter *in accordance with the terms of the loan agreement and chapter 13

plan*. The Settlement Order also includes a certification by Plaintiffs that "Prior to consenting to

---

[7]    This language is included in the form chapter 13 plan required for use in this District.

this settlement order, the payment obligations set forth in this Order, including the amounts, method, and timing of payments, and consequences of default were reviewed with and agreed to by the debtors or the party obligated to pay." Over the course of the bankruptcy case, Plaintiffs made 60 payments pursuant to the confirmed plan.

On August 1, 2016, Plaintiffs sent a letter to SLS requesting information pursuant to the Real Estate Settlement and Procedures Act. The letter stated, in pertinent part:

> The Note has a variable interest rate feature which should have changed beginning June 1, 2009 and every six months thereafter based on Section 4 of my Note. Although the Index has been below ½ of 1% since 2008, the rate has not changed over the life of the loan.
>
> Specifically, we are requesting the following information:
>
> 1. A payment history or schedule that can be easily read and understood listing the dates and amounts of all payments and transactions credited or debited to our account, including any escrow account and any suspense account, and showing how they have been applied or credited, or if not applied, showing how they have been treated;
> 2. A breakdown of the amount of claimed arrears or delinquencies on our account, including an itemization of all fees and charges you claim are currently due;
> 3. An explanation of how the amount due of $2,229.67 on the attached Interest Rate Change Notice dated May 11, 2016;
> 4. Please explain how the 8% rate was calculated disclosing the current 6 Month Libor Index Rate.
> 5. The payment dates, purpose of each payment, and recipient of any and all foreclosure fees and costs that have been charged to our account or have been advanced on our behalf since the loan inception.
> 6. The current balance in any suspense account as of June 31, 2016 and the reason why such funds were deposited in the account; and
> 7. Any notes created by your personnel reflecting communications with us about our account.

On August 15, 2016, SLS sent a letter to Plaintiffs acknowledging receipt of Plaintiffs' letter and advising that the case is currently under review. On September 6, 2016, SLS provided

a written response to Plaintiffs' August 1, 2016 letter, which attached a copy of the Note and

payment history, and stated as follows:

> SLS services the above referenced account according to the terms of
> the Note and Deed of Trust/Adjustable Rate Mortgage. The ARM
> Change Notification dated May 11, 2016 reflects that no changes
> were made. Enclosed for your reference is a copy of the Adjustable
> Rate Mortgage Note. If after reviewing this document you remain
> in dispute of the interest on the account, please send a separate
> dispute with your specific concerns outlined.
>
> Please refer to the enclosed payment history for payments and fees
> that have been assessed to the mortgage loan. As of the date of this
> letter there are no funds held in a suspence (sic) account and no late
> fees assessed to the account.
>
> All requests for any agreements other than those to which you are a
> signatory party are beyond the scope of a Qualified Written Request
> and accordingly are not being provided.
> …
> In researching your account, we have found no errors. You have a
> right to request the documents relied upon in reaching this
> determination by contacting us at the number below, but please note
> that SLS has already enclosed the same for your reference as
> outlined above.
>
> If have any questions regarding this information, please contact
> Customer Care toll free at 1-800-315-4757, Monday through Friday,
> 6:00 a.m. until 6:00 p.m. MT….

### *Disclosures & Notices to Plaintiffs by Defendants*

During the course of the Loan, Plaintiffs allege that they received the following disclosures

and notices from Defendants:

> April 14, 2006 – From Lendmark Financial Services: Truth In Lending Disclosures, Good
> Faith Estimate of Settlement Charges, Privacy Notices, Notice of Right to
> Receive a Copy of Appraisal, Servicing Rights Disclosure Statement,
> Borrower Authorization, SC – Disclosure of Agency to Receive Borrower
> Complaints, Attorney/Insurance Preference Check List, LIBOR 2/6, 3/6,
> 5/6, 2/28 and 3/27 Adjustable Rate Disclosure.[8]

---

[8]     The LIBOR 2/6, 3/6, 5/6, 2/28 and 3/27 Adjustable Rate Disclosure explains the features of the Adjustable
Rate Mortgage programs and how the interest rate and payment are determined. As explained by the Disclosure,
Plaintiffs' Loan was a 3/27 LIBOR ARM, which provided for fixed interest rate for three years and an adjustable rate

May 11, 2006 – LIBOR 2/6, 3/6, 5/6, 2/28 and 3/27 Adjustable Rate Disclosure [Doc. 146][9]

November 2, 2010 – Disclosure from BANA, through BAC Servicing, regarding Adjustable Rate Loan, stating that the interest rate on the Loan was 8%.

May 3, 2011 – Disclosure from BANA, through BAC Servicing, regarding Adjustable Rate Loan, stating that the interest rate on the Loan was 8%.

November 1, 2012 – BANA sent an Adjustable Rate Mortgage (ARM) Interest Rate Adjustment Notice stating that the interest rate on the Loan was 8%.

May 12, 2013 – BANA sent an Adjustable Rate Mortgage (ARM) Interest Rate Adjustment Notice stating that the interest rate on the Loan was 8%.

May 12, 2014 – SLS sent a Notice advising of a change in monthly payment from $2389.90 to $2389.89. The Notice advised that the interest rate would remain at 8% and the interest rate was calculated by taking the published 6 Month LIBOR and adding a margin of 5.12500%. It further stated that "Your rate cannot go higher than 14.00000% over the life of the loan. Your rate can change each year by no more than 1.00000%."

June 6, 2014 – BNYM filed a Notice of Mortgage Payment Change with the Bankruptcy Court, advising of the change in payment to $2389.89 and attaching the May 12, 2014 Notice from SLS.

May 23, 2017 - Shellpoint filed a Notice of Mortgage Payment Change with the Bankruptcy Court advising that the payment was changing from $2,229.66 to $2229.67 and the interest rate would remain at 8%. It further stated that "Your rate cannot go higher than 11.00%, or lower than 8.00% over the life of the loan. Your rate can increase every 6 months by no more than 1.00%. Your rate can decrease every 6 months by no more than 1.00%."

On February 2, 2018, the Trustee filed a Notice of Final Cure Mortgage Payment, reporting

that prepetition arrearage of $44,000 had been paid by the Trustee to BNYM through its servicers

BANA and SLS. On February 21, 2018, Shellpoint filed a Notice of Postpetition Mortgage Fees,

---

for the remaining 27 years. The Disclosure explains that (1) on the first adjustment, the interest rate cannot increase by more than 3 percentage points; (2) on each subsequent adjustment, your interest rate may not increase or decrease by more than 1 percentage point; (3) the interest rate cannot increase more than 6 percentage points over the life of the loan, and (4) "*Your interest rate will never be less than the initial rate.*" (emphasis added)

[9]    This LIBOR 2/6, 3/6, 5/6, 2/28 and 3/27 Adjustable Rate Disclosure is identical to the one dated April 14, 2006, except that it is signed by Plaintiffs and dated May 11, 2006).

Expenses, and Charges indicating that Plaintiffs owed $2,509.50 for Attorney Fees. On February 22, 2018, Shellpoint filed a Response to Notice of Final Cure Payment agreeing that Plaintiffs had paid in full the amount required to cure the prepetition default and asserting that Plaintiffs owed $2,509.50 for post petition attorney fees and were contractually obligated for the post petition payments that first became due on March 1, 2018. Plaintiffs did not respond to Shellpoint's Response to Notice of Final Cure Payment. On April 13, 2018, an Order Discharging Debtors was entered and Plaintiffs' bankruptcy case was closed.

## CONCLUSIONS OF LAW

### I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a), which is made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment phase, "[t]he pertinent inquiry is whether 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party makes a summary judgment motion, the burden is on the non-moving party to demonstrate there is a genuine issue of material fact for trial. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). The evidence presented must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Supreme Court has explained that "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly

preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will

not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.     Interest Rate Issue

The central issue raised in the Amended Complaint is whether the interest rate floor of 8%

set forth in the Adjustable Rate Rider to the Mortgage, but not set forth in the Note, was effective.

All claims set forth in Plaintiffs' Amended Complaint arise out of Plaintiffs' contention that they

were overcharged interest because the Note does not provide an interest rate floor and therefore

the interest rate should have been adjusted below 8% in accordance with the terms of the Note.

Plaintiffs have not identified any parol evidence they contend shows that the loan documents do

not have an interest rate floor. [See Exhibit G, Plaintiffs' Answers to BANA's First Set of

Interrogatories].  Instead, in response to the Motions, Plaintiffs assert that the Note at issue contains

forged signatures of Plaintiffs.

Notably, neither Plaintiffs' original Complaint nor their Amended Complaint in this

proceeding assert a forgery of the Note or violation of any statute or rule arising from this forgery.

Plaintiffs assert that they first learned of the second note (revealing the forgery of the Note) through

discovery received from Defendants on April 19, 2019.  However, since that discovery, they have

not filed a motion to amend the Amended Complaint to include allegations regarding the forgery

of the Note, and merely included what purports to be a request for amendment in an affidavit of

Plaintiffs' counsel attached to their objection to the Motions and as a footnote in their proposed

order regarding the Motions.[10]

---

[10]      Plaintiffs' counsel alluded to a motion to amend the Complaint during the hearing on the Motion for Summary
Judgment, but he did not make an express motion and the Court indicated that it would not hear arguments on a motion
to amend at that time.

Under South Carolina law regarding actions with respect to a negotiable instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings.  S.C. Code Ann. § 36-3-308. Plaintiffs were thus required to expressly deny the validity of the signatures in their complaint.  Both Plaintiffs were readily able to identify the signatures on the Note as forged during their depositions; however, Plaintiffs did not raise the authenticity of their signatures in the state court foreclosure action, their prior bankruptcy case, or their most recent bankruptcy case.   Plaintiffs are therefore deemed to have admitted that the signatures are theirs. *Nat'l Equip., Ltd. v. David Jones Sales, Trucking Div., Inc.,* 235 S.E.2d 125, 127 (S.C. 1977).

Moreover, Plaintiffs cannot defend Defendants' Motions by reference to unalleged theories and claims because asserting new claims in a brief submitted in opposition to a motion for summary judgment is procedurally improper. *Reese v. South Carolina Dept. of Mental Health,* C/A No. 3:16-3491-JFA, 2018 WL 4677714 (D.S.C. Sept. 28, 2018) (citing *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 564 (4th Cir. 2008) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *see also United States v. Jones*, No. 87-7313, 1988 WL 21257, at *1 (D.S.C. Mar. 9, 1988) (holding that the district court "did not err in failing to consider a new claim raised by [plaintiff] in a pleading ... which was filed in response" to a motion for summary judgment).  Plaintiffs did not seek leave to amend their Amended Complaint prior to the hearing on the Motions, and they have offered no justification for failing to seek leave to amend.  Accordingly, since it is procedurally improper to consider Plaintiffs' unalleged forgery theories at

14

this stage in the proceedings, the Court will disregard these arguments in connection with its ruling on the Motions.

The Court further observes that, as a practical matter, the issue of which of the two notes applied would only be relevant if the interest rate floor was determined to not apply.  As discussed more fully below, the Court finds that the interest rate floor does apply to prevent the interest rate from adjusting below 8%.  Plaintiffs admit that they signed a note in the principal amount of $304,000 payable to Lendmark.  The only difference between the two notes is the amount the interest rate can adjust at any change date (1% or 3%).  The interest rate floor applies to both notes. Because the interest rate has never adjusted from 8% for the duration of the loan and no adjustments up or down have been made, whether the interest rate would change 1% or 3%, if it ever changed, is of no consequence to the matters raised in the Amended Complaint.

The Court finds that the Loan unambiguously requires an interest rate floor of 8% in Paragraph (D) of the ARR, which states that the interest rate for the Note "will never be greater than 14.000%, or less than the initial interest rate [of 8%]."  The interest rate floor provision of the ARR supplements, rather than conflicts with, the Note.  Under South Carolina law, while a separate agreement will not affect the negotiability of an instrument, it is entirely proper for the terms of an instrument to be modified or affected by another written agreement executed as part of the same transaction.  See S.C. Code Ann. § 36-3-119(1) (2006) (providing that, "[a]s between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction" and that "[a] separate agreement does not affect the negotiability of an instrument." Plaintiffs executed the Note, Mortgage, and ARR on the same day in connection with the same transaction.  Therefore, they should be read as one unified document, giving effect to all provisions thereof.  Reading the Note,

Mortgage, and ARR together, and considering the absence of any parol evidence indicating a contrary intent of the parties, the Court finds that the interest rate provisions in the ARR expand and clarify the interest rate provisions contained in the Note, such that the maximum interest rate chargeable under the Loan documents is 14%, and the minimum interest rate chargeable under the Loan documents is 8%. Even after conducting discovery, Plaintiffs have been unable to present any evidence showing that they requested an interest rate without a floor or that Lendmark misled them about the terms of the loan. There is also no evidence showing that anything outside the loan documents modified the interest rate floor set forth in the loan documents.

The District Court suggested that whether the interest rate floor was specifically disclosed to Plaintiffs at closing may have some bearing on the parties' intent. Defendants presented evidence indicating a LIBOR 2/6, 3/6, 5/6, 2/28 and 3/27 Adjustable Rate Disclosure was provided to Plaintiffs on April 14, 2006 and again at the closing on May 11, 2006. This disclosure provides a table that explains how each of the LIBOR adjustable rate loans works over time, and expressly provides that for the applicable program, the 3/27 LIBOR ARM, "your interest rate will never be less than the initial rate." As stated in the Note and ARR, the initial interest rate was 8%. Plaintiffs admit they had the opportunity to review all of the Loan Documents and disclosures prior to signing. Plaintiffs presented no contrary evidence regarding this disclosure. Plaintiffs presented no evidence or affidavits of their closing attorney regarding conversations of the parties at closing.

Accordingly, there is no genuine issue of fact as to whether the parties intended for the Loan to provide an interest rate floor of 8%. In light of this conclusion, the Court will consider each of the causes of action in the Amended Complaint to determine whether a genuine issue of material facts remains as to any of these claims.

### III.    Count One as to all Defendants –Truth-in-Lending Act

Plaintiffs allege that they should have been provided with TILA disclosures, including an Adjustable Rate Disclosure Statement and Notice of Right to Rescind, when they applied for the refinancing but did not receive the disclosures until closing or not at all, in the case of the Notice of the Right to Rescind.  However, Defendants did not originate the loan and are not liable as assignees for TILA violations under 15 U.S.C. § 1641.  For an assignee to be liable for a TILA violation, the violation for which such action or proceeding is brought must be apparent on the face of the disclosure statement and the assignment to the assignee must be voluntary. 15 U.S.C. § 1641(e)(1).[11]  Plaintiffs have not alleged a TILA violation apparent on the face of the disclosure statement, and no evidence has been presented creating a genuine issue of fact as to whether the TILA violation was apparent on the face of the disclosure statement.  Moreover, TILA expressly provides that a servicer, a person responsible for receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, is not to be treated as an assignee "unless the servicer is or was the owner of the obligation." 15 U.S.C. § 1641(f).  Therefore, Defendants SLS and Shellpoint cannot be treated as assignees subject to liability for a TILA claim based upon nondisclosures at closing in this case.

Furthermore, Plaintiffs' TILA claim based upon the failure to make disclosures at closing would be barred by the one-year statute of limitations because the Complaint was filed more than

---

[11]    In their proposed order denying the Motions, Plaintiffs argue for the first time that "through a series of illegal and therefore void mortgage assignments, BANA has attempted to hide the fact it has liability for failure to disclose the interest rate floor when its predecessor, Countrywide Bank, NA 'table funded' the Dabney's loan." Again, it is procedurally improper to raise new claims in response to a motion for summary judgment, and even more so where an argument was not raised in Plaintiffs' objection to the motion for summary judgment or during the hearing on the motion.  *Reese v. South Carolina Dept. of Mental Health*, C/A No. 3:16-3491-JFA, 2018 WL 4677714 (D.S.C. Sept. 28, 2018) (citing *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 564 (4th Cir. 2008) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment).

10 years after the closing in 2006.  15 U.S.C.A. § 1640(e) (providing for a one-year statute of limitations for civil damages arising from TILA violations, which begins running from the date of the complained of violation).  Plaintiffs argue that the statute of limitations should be equitably tolled due to Defendants' misconduct.  For equitable tolling to apply, Plaintiffs must show: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of Plaintiffs' claim, and (2) Plaintiffs failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. *Supermarket of Marlinton v. Meadow Gold Dairies,* 71 F.3d 119, 122 (4th Cir. 1995).  The Court of Appeals for the Fourth Circuit has explained that equitable tolling, which is also known as the fraudulent concealment doctrine, tolls the statute of limitations until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment. *Browning v. Tiger's Eye Benefits Consulting,* 313 Fed.Appx. 656, 663 (4th Cir. 2009). Under the circumstances of this case, equitable tolling does not apply because there is nothing in the record showing that Plaintiffs were prevented from discovering the alleged TILA violation as a result of any concealment by Defendants.  Plaintiffs' claim is based upon a failure to receive required disclosures prior to closing.  Plaintiffs argue the alleged forgery of the Note supports equitable tolling in this case.  For the reasons discussed above, it is procedurally improper for the Court to consider the alleged forgery as support for equitable tolling. Furthermore, even if it did consider the forgery of the note, the existence of the forged note is unrelated to the lender's alleged failure to provide TILA disclosures at or prior to origination and would not serve to conceal the alleged TILA violation. "Application of the fraudulent concealment doctrine in the context of the disclosure requirements of TILA requires more than mere nondisclosure… Otherwise, in a context in which nondisclosure is the gravamen of the violation, then just about every failure by defendant to disclose as required by the TILA would seemingly

18

bring about tolling and would tend to eviscerate the limitations provision set forth in § 1640(e)."

*Strickland-Lucas v. Citibank, N.A.*, 256 F.Supp. 3d 616 (D.Md. 2017) (quoting *Davis v. Edgemere*

*Fin. Co.*, 523 F.Supp. 1121, 1126 (D. Md. 1981)).   Exercising reasonable diligence, Plaintiffs

should have been aware of the facts supporting their TILA claim—their failure to receive required

disclosures—as of the date of the closing.

The Amended Complaint further alleges that Defendants failed to provide disclosures that

accurately represent the adjustment of interest rates in violation of 12 C.F.R. 226.20(c), a

regulation that implements TILA and establishes uniformity in creditors' disclosures to borrowers.

12 C.F.R. 226.20(c) provides:

> (c) Variable-rate adjustments. ***An adjustment to the interest rate with or without a
> corresponding adjustment to the payment in a variable-rate transaction subject
> to § 226.19(b) is an event requiring new disclosures to the consumer***. At least
> once each year during which an interest rate adjustment is implemented without an
> accompanying payment change, and at least 25, but no more than 120, calendar
> days before a payment at a new level is due, the following disclosures, as
> applicable, must be delivered or placed in the mail:
> (1) The current and prior interest rates.
> (2) The index values upon which the current and prior interest rates are based.
> (3) The extent to which the creditor has foregone any increase in the interest rate.
> (4) The contractual effects of the adjustment, including the payment due after the
> adjustment is made, and a statement of the loan balance.
> (5) The payment, if different from that referred to in paragraph (c)(4) of this section,
> that would be required to fully amortize the loan at the new interest rate over the
> remainder of the loan term.

(emphasis added)

Plaintiffs allege that BANA made disclosures regarding the interest rate on the Loan on November

2, 2010, May 3, 2011, November 1, 2012 and May 12, 2013.   Plaintiffs further allege that SLS

sent a notice regarding the interest rate of the loan on May 12, 2014 and November 10, 2016, that

BNYM filed a notice on June 6, 2014, and Shellpoint sent notices on May 3, 2017 and November

1, 2017.   All notices received by Plaintiffs provide that the interest rate of the Loan remains 8%.

Over the life of the Loan, the interest rate never changed from 8%.  Accordingly, the disclosure requirements set forth in 12 C.F.R. §226.20 were never triggered.

Furthermore, the statute of limitations applicable to 12 C.F.R. § 226.20 is one year from the date of the occurrence of the violation.  Therefore, claims based upon the notices sent before March 30, 2016 (one year before the complaint was filed)[12] would be time-barred, and only the notices sent by SLS on November 10, 2016 and Shellpoint on May 3, 2017 and November 1, 2017 could serve as the basis for liability under 12 C.F.R. § 226.20, if applicable.[13]  There is no genuine issue of material fact that the post-2016 notices provide all of the information required under 12 C.F.R. § 226.20:  the current and prior interest rates, the index values upon which the current and prior interest rates were based, the extent to which it had foregone any increase in the interest rate, the contractual effects of the adjustment and the payment amount due.  Moreover, Plaintiffs allege that the notices were inaccurate because the interest rate should have adjusted downward.  As discussed above, the Court finds that the Loan unambiguously required an interest rate floor of 8% and therefore Plaintiffs were properly charged interest at the rate of 8% since the origination of the Loan.  Accordingly, Plaintiffs' claim under 12 C.F.R. § 226.20 fails even if it was determined to be applicable.

---

[12]    This Court previously found that the TILA causes of action filed in the Amended Complaint related back to the original Complaint. *See* Order Granting Motion to Amend Complaint, Adv. Pro. No. 17-80037 (January 15, 2019).

[13]    Plaintiffs argue that despite the expired SOL, they can assert the TILA claim as a matter of defense by recoupment or set-off since each defendant is attempting to collect under the Confirmed Plan. They cite *Matter of Coxson*, 43 F.3d 189, 194 (5th Cir. 1995), which holds that the mere fact that the debtor is the plaintiff in a TILA case does not preclude a finding that the claim was raised defensively. However, the Fifth Circuit in *Matter of Coxson* was applying Texas state law, not South Carolina law, and Plaintiffs have not cited any authority under South Carolina law supporting the application of the exception from *Matter of Coxson* in this case.  Additionally, at the time of the filing of the Amended Complaint asserting the TILA claim, the Confirmed Plan had been completed and Defendant Shellpoint had filed its Response to the Notice of Final Cure indicating that the arrearage had been paid in full and Plaintiffs were current on their loan, thus Defendants were no longer attempting to collect under the Confirmed Plan.

IV.    **Count Two as to All Defendants – Failure to provide required information under**
       **Fed. R. Bankr. P. 3002.1(b), (c) & (d)**

Plaintiffs allege "Defendants have failed to provide the information as required under Fed. R. Bankr. P. 3002.1(b), (c), & (d), which was neither substantially justified or harmless."  Plaintiffs argue that Defendants did not comply with Rule 3002.1 because they failed to notify the Court of changes in payment amounts.  Rule 3002.1(b) requires the holder of a claim to file and serve on the debtor, debtor's counsel, and the trustee "a notice of any change in the payment amount… no later than 21 days before a payment in the new amount is due." This rule allows the Court to award appropriate relief including reasonable expenses and attorney's fees caused by the failure to file notices in accordance with Rule 3002.1.  Plaintiffs argue that Defendants violated Rule 3002.1(b) by filing payment change notices in the Bankruptcy Case with an incorrect payment amount, interest rate, rate of change, and that fail to set forth the six-month LIBOR.  This argument is again based upon Plaintiffs' theory that the interest rate on the subject loan should have been lower than 8% and that the note providing for the 1% change rate was forged and not applicable.  For the reasons set forth above, these arguments fail.

The Court further observes that Plaintiffs entered into a Settlement Order on August 4, 2014, wherein they agreed to the amount of the regular monthly payments to be paid on the Loan and made such payments throughout the course of their bankruptcy case without objection, and ultimately benefitted by the curing of their default and maintenance of payments on the Loan and by avoiding the sale of their home in the state foreclosure action.  In addition, Plaintiffs did not timely object to any of the payment change notices filed in the bankruptcy case pursuant to Rule 3002.1(b)(2) and therefore the changes went into effect. *See* Fed. R. Bankr. P. 3002.1(b) advisory committee's note (clarifying that Rule 3002.1(b)(2) "acknowledge[s] the right of the trustee,

debtor, or other party in interest… to object to a change in a home-mortgage payment amount after receiving notice of the change under subdivision (b)(1)," and that subject to a contrary court order, "if no motion has been filed on or before the day before the change is to take effect, the announced change goes into effect.")

Plaintiffs allege that Defendants failed to file payment notice changes in compliance with Rule 3002.1.  The proof of claim for Bank of America was filed by Debtor's bankruptcy counsel on February 28, 2014.  On June 6, 2014, a notice of assignment of the claim to BNYM was filed as well as a notice of mortgage payment change from BNYM, changing the Plaintiffs' monthly payment from $2,229.67 to $2,229.66.  On August 4, 2014, Plaintiffs and SLS entered into the Settlement Order wherein they agreed to continue making regular post petition monthly payments in accordance with the terms of the Loan as well as post petition arrearage payments of $134.92 per month for six months.  Plaintiffs allege in the Complaint that SLS sent Plaintiffs a notice on November 11, 2014, representing that the payment was $2,389.90, but failed to file a corresponding Rule 3002.1 Notice.  A copy of this Notice is not in the record.

In their Response to Defendants' Motion, Plaintiffs further argue that the payment histories produced by Defendants evidence $27,000 in fees and expenses assessed against Plaintiffs that were required to be disclosed under Fed. R. Bankr. P. 3002.1(c).  Rule 3002.1(c) requires the holder of a claim to file and serve "a notice itemizing fees, expenses, or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed, and (2) that the holder asserts are recoverable against the debtor or against the debtor's principal residence." On February 21, 2018, Defendant Shellpoint, on behalf of BNYM, filed a Notice of Postpetition Fees, Expenses and Charges, indicating post petition charges of $2,509.50 for attorney's fees.  Further, on February 22, 2018, Defendant Shellpoint, on behalf of BNYM, filed a Response to Notice of Final

Cure Payment pursuant to Rule 3002.1, agreeing that Plaintiffs have paid in full the amount required to cure the prepetition default on the creditor's claim, and stating again that Plaintiffs owe post petition charges of $2,509.50 for attorney's fees. These notices were filed using the appropriate Official Forms in compliance with Fed. R. Bankr. P. 3002.1(d).

Plaintiffs have presented no evidence of Defendants asserting that $27,000 in fees and expenses remain due from Plaintiffs. Moreover, the Plaintiffs appear to simply assert that the payment histories alone establish a violation, without providing any specific information as to which fees or expense they believe should have been disclosed. In order to survive a motion for summary judgment, the non-moving party cannot rely solely on bald allegations or conclusory statements. *See Strickland v. Acevedo Restaurants, Inc.*, No. 2:11-cv-2566-RMG, 2014 WL 798402, at *5 (D.S.C. Feb. 27, 2014). "Rather, the non-moving party must demonstrate that *specific*, material facts exist which give rise to a genuine issue." *Id.* (emphasis added). The evidence in the record indicates that, at the time the bankruptcy plan was completed and the case was closed, Defendants agreed that Plaintiffs had cured the prepetition default and owed only $2,509.50 in post petition charges, which were disclosed in accordance with Fed. R. Bankr. P. 3002.1(c). Plaintiffs' general and conclusory statements that Defendants failed to disclosed $27,000 in fees without specifying which fees should have been disclosed "are simply not evidence to survive a properly supported motion for summary judgment." *Smith v. Coffy,* C/A No. 2:08-0201-PMD-BM, 2010 WL 1294112, at *6 (D.S.C. Feb. 26, 2010). Accordingly, the Court finds that Plaintiffs have failed to demonstrate a genuine issue of fact for trial regarding a claim under Fed. R. Bankr. P. 3002.1(b), (c), or (d).

23

## V.    Count Three as to All Defendants – Fed. R. Bankr. P. 3001(c)(1) & (2)

Plaintiffs allege that Defendants failed to supplement their proof of claim to reflect the correct interest rate and payment. This claim is also based upon Plaintiffs' theory that the interest rate on the subject loan should have been lower than 8% and that the note providing for the 1% change rate was forged and not applicable.  For the reasons set forth above, a claim based upon these arguments fails as a matter of law.  Furthermore, Plaintiffs' own bankruptcy counsel filed the proof of claim at issue as allowed by Fed. R. Bankr. P. 3004.  During the applicable time period, Fed. R. Bankr. P. 3002 did not require a secured creditor to file a proof of claim.[14]  It seems illogical that a creditor choosing not to participate in a bankruptcy case by filing a proof of claim would be required to supplement a proof of claim filed by the debtor that was missing attachments required by Fed. R. Bankr. P. 3001(c)(1) and (2), all of which are required to be filed with the proof of claim.  Rule 3001(c)(1) requires a secured creditor whose claim is based on a writing to file a copy of the writing with the proof of claim.  Rule 3001(c)(2) requires a secured creditor holding an interest in an individual debtor's property to also file (1) an itemized statement of the interest, fees, expenses, or charges with the proof of claim, (2) a statement of the amount necessary to cure any default with the proof of claim, and (3) an attachment prescribed by the appropriate Official Form and escrow account statement with the proof of claim.  Even if the Rules could be interpreted as imposing such a requirement, the relief provided by Fed. R. Bankr. P. 3001(c)(2)(D) is discretionary relief and the Court finds that Defendants' failure to file any such attachments is substantially justified by the fact that the proof of claim was filed by Plaintiffs' counsel.  *See* Fed. R. Bankr. P. 3001(c)(2)(D) (providing that if the holder of the claim fails to provide any

---

[14] In 2017, Fed. R. Bankr. P. 3002 was amended to provide that "[a] secured creditor, unsecured creditor, or equity security holder must file a proof of claim or interest for the claim or interest to be allowed…." Even after this amendment, a secured creditor can choose to rely on its lien and elect not to participate in the bankruptcy case.

information required by (c), the court may, after notice and hearing, take either or both of the following actions: (1) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or (2) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure). The Court further observes that other courts have held that there is no private right of action for violations of Fed. R. Bankr. P. 3001(c)(1) and (2). *Midland Funding, LLC v. Thomas*, No. 5:18-cv-00128, 2019 WL 3806640 (W.D.Va.Aug. 13, 2019). For the foregoing reasons, the Court concludes that Plaintiffs have failed to demonstrate a genuine issue of material fact for trial as to a claim under Fed. R. Bankr. P. 3001(c).

## VI.    Count Four as to BANA – 11 U.S.C. § 502(a)

In their Fourth Cause of Action, labeled "Violation of 11 U.S.C. § 502(a)," Plaintiffs allege that "[b]y asserting that the Adjustable Rate Rider controls, instead of the Adjustable Rate Note, BANA has filed a false and/or fraudulent proof of claim under 11 U.S.C. § 501." Plaintiffs further argued at the hearing on the Motion that the proof of claim was fraudulent because they assert the note attached to the proof of claim contains forged signatures. Accordingly, Plaintiffs request that the Court issue sanctions pursuant to 11 U.S.C. § 105(a) and any other applicable law, attorney's fees and such other relief as just and proper. "Section 105 gives to bankruptcy courts the broad power to implement the provision of the bankruptcy code and to prevent an abuse of the bankruptcy process, which includes the power to sanction counsel." *In re Ulmer*, 363 B.R. 777, 781 ( Bankr. D.S.C. 2007) (quoting *In re Clark*, 223 F.3d 859, 864 (8th Cir. 2000)). Based on the Court's previous conclusion that the Adjustable Rate Rider controls and the interest rate floor applies, as well as its conclusion that it is procedurally improper to consider Plaintiffs' unalleged forgery

theories at this stage in the proceedings, this claim must also fail.  The Court also notes the allegedly fraudulent proof of claim serving as the basis for this cause of action was filed by Plaintiffs' counsel, not BANA, and Plaintiffs did not object to the proof of claim during the pendency of their bankruptcy case and fully paid the  prepetition arrearage set forth in the proof of claim.  The Court finds that the Plaintiffs have failed to demonstrate a genuine issue of material fact for trial regarding whether an abuse of the bankruptcy process has occurred through the filing of BANA's proof of claim, requiring the Court to exercise its powers to award sanctions under § 105.

### VII.   Counts Five and Six as to all Defendants – 11 U.S.C. § 362(a)(3)

In their Fifth and Sixth Causes of Action, Plaintiffs allege that Defendants' actions in demanding payment in excess of the amounts owed (in the amount of $2,229.67 per month) through collection letters, "TILA Notices," Payment Change Notices and Motions for Relief constituted acts to obtain possession or control of property of the estate.  They further allege that retaining possession of overpayments made by Plaintiffs constitute willful violations of the automatic stay. To state a claim for a willful stay violation, a plaintiff has the burden of pleading and ultimately proving five (5) elements: "(1) that a bankruptcy petition was filed, (2) that the debtors are 'individuals' under the automatic stay provision, (3) that the creditors received notice of the petition, (4) that the creditors' actions were in willful violation of the stay, and (5) that the debtor suffered damages." *In re Weatherford*, 413 B.R. 273, 284 (Bankr. D.S.C. 2009).  Plaintiffs have failed to explain the factual or legal basis for their conclusion that the automatic stay attached to the voluntary prepetition payments made to Defendants by Plaintiffs.  They have further failed to establish that the post petition payments Plaintiffs voluntarily made to Defendants remained property of the estate after they were transferred to Defendants. These causes of action are entirely

predicated upon Plaintiffs' contention that interest rate floor set forth in the Adjustable Rate Rider does not apply and they were overcharged interest, which the Court has previously rejected for the reasons set forth above. Furthermore, the amount of the monthly payment was expressly agreed to by the Plaintiffs in the Consent Order resolving the motion for relief from stay filed by SLS on behalf of BNYM in the underlying bankruptcy case.  Plaintiffs did not seek relief from that Consent Order to dispute the payment amount during the bankruptcy case.  The Court and Defendants SLS and BNYM are entitled to rely on Plaintiffs' agreement to the payment amount and obligations of the Consent Order.  For these reasons, Plaintiffs have failed to demonstrate that Defendants' actions were in willful violation of the automatic stay. Since Plaintiffs have failed to demonstrate that a genuine issue of material fact exists as to the Fifth and Sixth Causes of Action, summary judgment in favor of Defendants is proper.

### VIII.    Count Seven as to BANA & SLS – 12 U.S.C. § 2605 et seq. (RESPA)

Plaintiffs allege in their Seventh Cause of Action that Defendants SLS's response to their August 15, 2016 written request for information and notice of error was insufficient and thus violated 12 U.S.C. § 2605 (RESPA).  They further allege that SLS & BANA failed to properly correct their errors regarding Plaintiffs' account and return the money to Plaintiffs, despite their August 15, 2016 letter.  Plaintiffs allege this conduct violates 12 U.S.C. §§ 2605(k)(1)(C), which provides that a servicer of a federally related mortgage shall not— … fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties. Therefore, Plaintiffs assert they are entitled to damages under 12 U.S.C. § 2605(f), which provides that "[w]hoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts." Defendants SLS and BANA argue that Plaintiffs'

letter does not satisfy the definition of a qualified written request. A "qualified written request" under 12 U.S.C. § 2605(e)(1)(B) is a "written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that –(i) includes or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."

In their August 15, 2016 letter, which included their name and account number, Plaintiffs stated "[t]he Note has a variable interest rate feature which should have changed beginning June 1, 2009 and every six months thereafter based on Section 4 of my Note. Although the Index has been below ½ of 1% since 2008, the rate has not changed over the life of the loan." Plaintiffs' letter goes on to make the following request: "Please explain how the 8% rate was calculated disclosing the current 6 Month Libor Index Rate." Since it includes the name and account of the borrower, a statement of the Plaintiffs' believe that the account is in error, and a request for information regarding the calculation of the interest rate, Plaintiffs' letter appears to meet the requirements for a qualified written request as defined by 12 U.S.C. § 2605(e)(1)(B).

SLS timely provided a written response to Plaintiffs' August 1, 2016 letter, which attached a copy of the Note and payment history, and stated as follows:

> SLS services the above referenced account according to the terms of the Note and Deed of Trust/Adjustable Rate Mortgage. The ARM Change Notification dated May 11, 2016 reflects that no changes were made. Enclosed for your reference is a copy of the Adjustable Rate Mortgage Note. If after reviewing this document you remain in dispute of the interest on the account, please send a separate dispute with your specific concerns outlined.

> Please refer to the enclosed payment history for payments and fees that have been assessed to the mortgage loan. As of the date of this letter there are no funds held in a suspence (sic) account and no late fees assessed to the account.

> All requests for any agreements other than those to which you are a
> signatory party are beyond the scope of a Qualified Written Request
> and accordingly are not being provided.
> …
> In researching your account, we have found no errors.  You have a
> right to request the documents relied upon in reaching this
> determination by contacting us at the number below, but please note
> that SLS has already enclosed the same for your reference as
> outlined above.
>
> If have any questions regarding this information, please contact
> Customer Care toll free at 1-800-315-4757, Monday through Friday,
> 6:00 a.m. until 6:00 p.m. MT….

As explanation for its calculation of the interest rate on the loan and to respond to Plaintiffs'

inquiry, SLS provided only a copy of the Note and payment history. No further explanation

regarding how the interest rate was calculated was provided in SLS's response. As discussed

above, the interest rate of the Loan must be determined by examining both the Note and the ARR,

as parts of one unified transaction, but the ARR was not provided or referenced in SLS's response.

Accordingly, there appears to be a genuine issue of material fact as to whether SLS's response

included "the information requested by the borrower or an explanation of why the information

requested is unavailable or cannot be obtained by the servicer," as required by 12 U.S.C. §

2605(e)(2)(B).

Defendants SLS and BANA further argue that the information requested does not relate to

the servicing of the loan and is therefore not a qualified written request.  Under the terms of the

loan documents, it appears that the servicer is responsible for calculating the interest rate on the

change dates provided under the Note.  The evidence presented includes the Notices of Interest

Rate and Payment Changes sent by SLS to Plaintiffs, which state: "We calculated your interest

rate by taking a published "index rate" and adding a certain number of percentage points, called

the "margin."  Based on this evidence, the Court finds there appears to be a genuine issue of

material fact as to whether Plaintiffs' request was related to the "servicing of the loan" and therefore constitutes a qualified written request.

Finally, Defendants argue that Plaintiffs have not shown any damages resulting from SLS's alleged RESPA violation, which is a requirement for relief under RESPA.  12 U.S.C. § 2605(f) provides that "[w]however fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts... In the case of any action by an individual, (A) an amount equal to the sum of any actual damages to the borrower as a result of the failure; and (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000."  In this case, Plaintiffs have neither alleged nor produced any evidence that SLS or BANA have engaged in a pattern or practice of noncompliance with this section.  Vague, unsupported statements made by Plaintiffs' counsel at the hearing that Defendants and other large financial institutions have engaged in unspecified misconduct in other unspecified situations is insufficient to satisfy Plaintiffs' burden of showing a "pattern or practice of noncompliance."

In this district, to show actual damages, Plaintiffs must establish some "pecuniary loss as a result of Defendant[s]' failure to respond. *Turnage v. JPMorgan Chase Bank,* C/A No. 2:11-2916-RMG, 2012 WL 12354226, at *2 (D.S.C. Apr. 13, 2012); *Serfass v. CIT Group/Consumer Fin. Inc.,* C/A No. 8:07-90-WMC, 2008 WL 4200356, at *5 (D.S.C. Sept. 10, 2008) (requiring plaintiffs to show economic harm as a result of not receiving a written explanation of the amount due on their loan in response to QWR).  Plaintiffs contend that the failure of SLS/BANA to address Plaintiffs' years of overpayments has resulted in the Defendants' unlawful retention of monies that rightfully belong to the Plaintiffs and contributed to, if not caused this bankruptcy proceeding. Plaintiffs' RESPA claim fails because their claim of actual damages is based entirely upon their

claim that they were overcharged interest, which the Court has concluded is erroneous for the reasons previously stated in this Order.  Plaintiffs presented no other evidence of actual damages caused by their failure to receive a written explanation of how their interest rate was calculated. The mere recitation of damages in the Complaint without any supporting facts is insufficient to support their RESPA claim.  *See In re Nix*, C/A No. 10-01103, <u>2012 WL 27667</u>, at *10 (Bankr. D.S.C. Jan. 5, 2012).   Accordingly, based upon Plaintiffs' failure to establish actual damages caused by the alleged RESPA violation, the Court finds that Defendants SLS and BANA are entitled to summary judgment as to Plaintiffs' RESPA cause of action.

**IX.** **Count Eight as to all Defendants – <u>11 U.S.C. § 524(i)</u>**

Plaintiffs allege in their Eighth Cause of Action that Defendants violated the confirmed plan and the discharge injunction by applying post petition regular monthly payments to pre-petition arrearages.  Plaintiffs' confirmed plan provides: "Beginning August 2013, the Debtor shall pay directly to the creditor non-arrearage payments arising under the agreement with the secured creditor.   The creditor shall apply each payment under this paragraph solely to post-petition obligations that accrue during or after the month specified herein."  Plaintiffs allege that certain payments made to SLS were misapplied to "outstanding fees" and "escrow amounts due" prepetition.

Section 524(i) provides:

> The willful failure of a creditor to credit payments received under a plan confirmed under this title, unless the order confirming the plan is revoked, the plan is in default, or the creditor has not received payments required to be made under the plan in the manner required by the plan (including crediting the amounts required under the plan), shall constitute a violation of an injunction under subsection (a)(2) if the act of the creditor to collect and failure to credit payments in the manner required by the plan caused material injury to the debtor.

Plaintiffs allege that "[t]hrough fraudulent and deceptive alteration of records in violation of disclosures required under Bankruptcy Procedures, the Defendants have misapplied over $108,885.95 in post petition payments in violation of the Confirmed Order and 11 U.S.C. § 524(i)." As evidence of the misapplication of payments, Plaintiffs referred to the payment history attached as Exhibit F to Defendants' Motion.

Plaintiffs' allegation that Defendants' misapplied over $108,885.95 in post petition payments is not supported by the evidence.  Even if Defendants misapplied payments during the course of the bankruptcy case by applying post petition regular monthly payments to prepetition arrearage, at the end of the bankruptcy case, when all payments had been made pursuant to the confirmed plan, Defendant Shellpoint asserted in its Response to the Notice of Final Cure that Plaintiffs' pre-petition arrearage of $44,000 was paid in full and that Plaintiffs were current with their post petition payments.[15]  As a practical matter, any alleged misapplication had no effect on Plaintiffs' account at the time Plaintiffs received their discharge and their case was closed. Plaintiffs benefitted by having the opportunity to catch up their payments and avoiding a foreclosure sale of their home. Plaintiffs have not alleged that Defendants have sought to collect any additional amounts from Plaintiffs post discharge.  In order to obtain relief under 11 U.S.C. § 524(i), Plaintiffs must demonstrate that "the act of the creditor to collect and failure to credit payments in the manner required by the plan *caused material injury to the debtor*." Plaintiffs have failed to show any material injury caused by the alleged misapplication.  For this reason, Plaintiffs' cause of action for violation of 11 U.S.C. § 524(i) must fail.

---

[15]    Defendant Shellpoint did assert that Plaintiffs had a post petition balance of $2,509.50 for Attorney Fees related to this litigation.  Plaintiffs have not argued that this balance resulted from misapplication of payments during the bankruptcy case.  Section 506(b) of the Bankruptcy Code allows oversecured creditors to add reasonable post-petition interest, costs, or other charges (such as attorney's fees) permitted by the underlying contract to the amount of their secured claim.

X.    **Count Nine as to all Defendants – Violation of the South Carolina Unfair Trade Practices Act**

Plaintiffs assert that Defendants have violated the South Carolina Unfair Trade Practices Act (SCUTPA) by repeatedly misrepresenting the amount of the loan, the basis of the loan (the Note), the amount of payments and the applicable interest rate to the Plaintiffs. All of these allegations are based upon Plaintiffs' argument that they were overcharged interest under the terms of the Note and their related assertion that the note was forged. Since the Court has rejected these arguments for the reasons set forth herein, Plaintiffs' SCUTPA claim must also fail. Despite vague references in the Complaint, Plaintiffs' have not presented specific argument or evidence of any other grounds for relief under SCUPTA in their response to the Motion for Summary Judgment, during the hearing on the Motion, or in their proposed order regarding the Motion.

Additionally, Plaintiffs have offered no evidence that any of Defendants' alleged actions impact the public interest, which is a requirement for asserting a SCUPTA claim. *Jefferies v. Phillips*, 451 S.E.2d 21, 23 (S.C. Ct. App. 1994) (stating that "conduct which only affects the parties to the transaction provides no basis for a[n unfair trade practices] claim.") An impact on public interest can be shown by "proving that the same kind of actions occurred in the past or by showing that the procedures employed by the Defendant create a potential for repetition of deceptive practices." *Schnellman v. Roettger*, 627 S.E.2d 742, 746 (S.C. Ct. App. 2006) (citing *Crary v. Djebelli*, 496 S.E.2d 21, 23 (S.C. 1998)). Plaintiffs have merely alleged in their Amended Complaint a conclusory recitation of the elements of a SCUPTA claim: "Defendants' conduct is capable of repetition, and upon information and belief, has been repeated" and "affects the public interest. Plaintiffs failed to offer any evidence or allegations of specific facts demonstrating how, when, or where any purported acts occurred in the past or how Defendants' procedures create a

potential for repetition.  Accordingly, summary judgment in favor of Defendants on Plaintiffs'
SCUTPA claim is appropriate.

**XI.    Count Ten as to all Defendants – Contempt  (11 U.S.C. § 105)**

In their Tenth Cause of Action, Plaintiffs request "that this Court fashion a fair and
equitable remedy under 11 U.S.C. § 105 for the wrongs committed by the Defendants set forth
within this pleading, and any uncovered in discovery."

Section 105 provides:

> The court may issue any order, process, or judgment that is necessary or appropriate
> to carry out the provisions of this title.  No provision of this title providing for the
> raising of an issue by a party in interest shall be construed to preclude the court
> from, sua sponte, taking any action or making any determination necessary or
> appropriate to enforce or implement court orders or rules, or to prevent an abuse of
> process.

"Courts have recognized that the authority provided to bankruptcy courts under § 105 gives the
Court power 'to issue any order, process, or judgment that is necessary or appropriate to carry out
the provisions of this title.'" *In re Weathers,* 604 B.R. 13 (Bankr. D.S.C. 2019); *In re Walters,* 868
F.2d 665, 669 (4th Cir. 1989) (stating that "a court of bankruptcy has authority to issue any order
necessary or appropriate to carry out the provisions of the bankruptcy code.").  While the court's
authority under § 105 is broad, it is not without limits.  *See Taggart v. Lorenzen,* 139 S.Ct. 1795
(2019) ("The bankruptcy statutes… do not grant courts unlimited authority to hold creditors in
civil contempt.").  Section 105 provides the bankruptcy court with the authority to find a party in
civil contempt for failure to comply with its orders, violations of the Bankruptcy Code and Rules,
or abuse of process. *In re Berry,* 582 B.R. 886, 892-93 (Bankr. D.S.C. 2018), *aff'd,*  C/A No. 2:18-
444-MBS, 2019 WL 1034484, slip op. at *6 (D.S.C. Mar. 5, 2019).  However, it does not create a
private cause of action unless it is invoked in connection with another section of the Bankruptcy
Code, the Bankruptcy Rules, or an order of this Court. *See In re French,* 401 B.R. 295 (Bankr.

E.D. Tenn. 2009); *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417 (6th Cir. 2000) ("[Section 105] does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law.") For the reasons set forth herein, the Court has rejected each of Plaintiffs' claims based upon alleged violations of the Bankruptcy Code and Rules. Plaintiffs also have not alleged or presented evidence demonstrating that Defendants violated the terms of any order of this Court and suffered harm as a result or that Defendants have engaged in conduct amounting to an abuse of process. Moreover, Plaintiffs failed to present any arguments to overcome Defendants' Motion for Summary Judgment as to this cause of action under § 105 in their Objection or in their proposed order submitted to the Court. Therefore, the Court finds that Plaintiffs' claim for contempt under 11 U.S.C. § 105 fails as a matter of law.

## XII.    Plaintiffs' Request for Relief under Fed. R. Civ. P. 56(d)

By affidavit of Plaintiffs' counsel, Robert Varnado, which is attached to Plaintiffs' Objection to Defendants' Motions, Plaintiffs make the following request "I believe the issue of the conflicting notes [the 3% Note versus the 1% Note] requires further discovery and would ask this Court to provide appropriate relief under Rule 56(d) of the Federal Rules of Civil Procedure." Fed. R. Civ. P. 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1)    defer considering the motion or deny it;
> (2)    allow time to obtain affidavits or declarations or to take discovery; or
> (3)    issue any other appropriate order.

By order entered August 13, 2019, the undersigned denied Plaintiffs' Motion seeking an extension of time for discovery, which was similarly based upon Plaintiffs' discovery of the second

note and alleged forgery of the Note.[16]  In that Order, the Court denied relief based upon Plaintiffs'
overall lack of diligence in utilizing available discovery mechanisms to timely complete discovery
according to the Scheduling Order and failure to satisfactorily explain why the discovery deadline
set forth in the Court's Scheduling Order could not have been met with their diligent effort, among
other reasons. The Court further observes again that only difference between the two notes is the
amount the interest rate can adjust at any change date (1% or 3%).  The interest rate floor applies
to both notes.  Because the interest rate has never adjusted from 8% for the duration of the loan
and no adjustments up or down have been made, whether the interest rate would change 1% or
3%, if it ever changed, is of no consequence to the matters raised in the Amended Complaint, and
therefore more discovery would not be helpful.  Based upon the reasons more fully set forth in the
Court's August 13, 2019 Order and Plaintiffs' failure to demonstrate any new evidence, changed
circumstances, or other reason justifying relief since the hearing on the previous Motion for an
extension of time for discovery,[17] the Court denies the Motion.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted as to all
causes of action raised in the Complaint and Plaintiffs' motion for relief under Fed. R. Civ. P.
56(d) is denied.

**AND IT IS SO ORDERED.**

---

[16]    The assertion that the signatures on the Note were forged was first made in the proposed order submitted by
Plaintiffs regarding the Motion for extension of discovery deadline and was considered by the Court in its Order
denying the motion.

[17]    The existence of the second note was discovered as a result of discovery delivered to Plaintiffs on April 19,
2019 by SLS.